**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**BAYLOR UNIVERSITY MEDICAL**
**CENTER, Defendant-Appellant.**

No. 83–1398.

United States Court of Appeals,
Fifth Circuit.

July 19, 1984.

---

Smith, Smith & Florsheim, Robert W. Smith, Bowen L. Florsheim, Robert B. Cook, Jr., Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., Cheryl B. Wattley, Asst. U.S. Atty., Dallas, Tex., Mark Gross, William Bradford Reynolds, Walter W. Barnett, Appellate Sect., Civil Rights Div., U.S. Dept. of Justice, Washington, for plaintiff-appellee.

Herbert Semmel, New York City, for amicus American Public Health Assn.

Before BROWN, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

Does the receipt of Medicare and Medicaid payments subject a hospital to the coverage of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Supp.1982), prohibiting discrimination based on handicap in programs or activities that receive federal financial assistance? Today we decide this question—one of first impression in the courts of appeal,[1] but one foreshadowed by Supreme Court authority—in the affirmative. We hold that Baylor University Medical Center (Baylor), whose inpatient and emergency room services receive Medicaid and Medicare payments, must allow the Department of Health and Human Services (HHS) access to the facility and information requested for the purposes of investigating a complaint of discrimination on the

---

1. We recognize that in *NAACP v. Wilmington Medical Center*, 599 F.2d 1247 (3rd Cir.1979), the Third Circuit affirmed a district court opinion holding, in part, that Medicare and Medicaid trigger § 504. However, the court of ap-

peals did so with no discussion of the issue; indeed, the affirmance on this point is only explicitly evident in the language of a footnote. *See* 599 F.2d at 1248, n. 4; *see* generally *infra* at 1046.

basis of handicap. In so holding, we affirm the decision of the district court. However, we find that the district court's immediate suspension of all Medicare and Medicaid payments to Baylor until it allows HHS the statutorily required access unduly penalizes beneficiaries of programs supported by these forms of federal assistance—i.e., patients and would-be patients in Baylor's inpatient and emergency programs. Vacating the district court's order as an abuse of discretion, we substitute our own order: that Baylor comply with HHS's request within 30 days or face termination of Medicare and Medicaid funds.

### Background

In May 1980, HHS received a complaint that Baylor refused to allow a deaf patient to bring an interpreter into the hospital (at no expense to the hospital) so that she could understand her pre- and post-operative discussions with the medical staff. HHS informed Baylor by letter that, as a recipient of federal financial assistance, it was obliged to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1982), and that HHS had received a complaint that Baylor's actions may have violated the Act. Section 504 states, in relevant part:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

HHS stated in the letter that it was responsible for investigating the complaint of discrimination and that an on-site review would be necessary. Baylor responded that, in its view, it is not a recipient of federal assistance for purposes of coverage of Section 504 and refused to allow the investigation. Further negotiation failed to resolve the impasse.

In March 1982, the United States filed suit, alleging that Baylor's refusal to permit HHS access to the Center's facilities in order to investigate the complaint HHS had received violated Section 504 and federal regulations implementing the Act. Baylor moved for summary judgment on the ground that none of the federal funds it received constituted federal financial assistance for the purposes of Section 504. The United States cross-moved for summary judgment; noting that Baylor had stipulated that it received Medicare and Medicaid funds,[2] the United States argued that these funds constituted federal financial assistance to Baylor, assistance that empowered HHS to investigate Baylor's compliance with Section 504.

The district court granted the government's motion, 564 F.Supp. 1495 (N.D.Tex. 1983). It held: (a) the government had the right to sue to enforce Baylor's contractual assurance that it would comply with Section 504, thus creating federal jurisdiction, (b) the rights and duties of Section 504 apply to recipients of federal financial assistance; since Baylor received Medicare and Medicaid funds, it is the "recipient" of the funds and so must honor those rights and duties if the funds are federal financial assistance, and (c) Medicare and Medicaid are "federal financial assistance" for the purposes of Section 504. In reaching the last conclusion, the court noted that the substantive provisions of the Rehabilitation Act were modeled on Title VI, 42 U.S.C. § 2000d *et seq.*, and Title IX, 20 U.S.C. § 1681; therefore, in interpreting the Act, courts must look to the judicial interpretation of those two major civil rights statutes. The court found support for holding that Medicare and Medicaid trigger Section 504 in HHS regulations which explicitly state that Medicare and Medicaid are "federal financial assistance for Section 504 purposes," *see* 45 C.F.R. § 80, App. A ¶ 121 (Medicare), and 45 C.F.R. § 84, App. A Subpart A, Def. 1 (Medicaid), in district

---

**2.** Baylor's records show that for the fiscal year ending June 30, 1980, the hospital's inpatient and emergency room services received over $29 million in Medicare (Part A) funds alone. Baylor stipulated that it continues to receive Medicare and Medicaid funds.

court holdings in this and other circuits, and in the legislative history of Section 504, Title VI, and the Medicare/Medicaid legislation. Citing *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), for the proposition that government benefits are not a contractual interest or property right, the court rejected Baylor's argument that Medicare and Medicaid come under the exception in the Rehabilitation Act for contracts of insurance. Last, the court found that HHS had properly targeted a "program"—Baylor's inpatient and emergency room services—for investigation, and noted that the fact that the actual complainant was not a Medicare or Medicaid recipient did not prevent HHS's investigation since the Rehabilitation Act is intended to prohibit discrimination in *"programs* which receive federal financial assistance" without limiting that protection to the direct beneficiaries of the federal assistance. The court determined that Baylor had violated Section 504 and applicable regulations in denying HHS access to the information requested and ordered that all future Medicare and Medicaid payments be suspended so long as Baylor continues to deny HHS access. This Court stayed the order pending appeal. 711 F.2d 38, 39 (5th Cir.1983).

## I.

In granting a stay pending appeal, we recognized that "[w]hether Medicare and Medicaid payments constitute federal financial assistance within the meaning of the Rehabilitation Act is a serious legal question that could have a broad impact upon federal/state relations" and, therefore, "a court ... would want to make a detailed and in-depth examination of this ... issue" before authorizing the investigation requested here. *Baylor*, 711 F.2d at 40. This appeal also requires us to define the scope of coverage: did the district court properly define the "program or activity" receiving federal assistance in per-

mitting the HHS investigation to cover inpatient and emergency room services? Finally, is the remedy ordered by the district court—immediate termination of all Medicare and Medicaid payments until Baylor allows HHS the requested access—within the court's power and within the judicious exercise of its discretion?

We hold that Medicare and Medicaid are federal financial assistance for the purpose of Section 504, and that the district court did not err in defining inpatient and emergency room services as the "program or activity" that would be the appropriate target of HHS's investigation as the result of the alleged violation of Section 504. However, we conclude that, in the circumstances of this case, the district court abused its discretion [3] in ordering immediate termination of payments, and we accordingly revise its order so as to grant the hospital a reasonable grace period to comply with HHS investigatory requests.

■ *A.* We ground our determination that the receipt of Medicare and Medicaid payments triggers Section 504 coverage on three congruent sources: the legislative history of that group of statutes prohibiting discrimination in federally funded programs—Title VI, Title IX and the Rehabilitation Act, judicial interpretation of these, and regulations adopted pursuant to them. Our examination of these sources indicates that this court could not excuse from the coverage of Section 504 and its counterparts hospitals that participate in Medicare and Medicaid without frustrating Congress' clear and consistent purpose to protect handicapped persons and members of minority groups from discrimination in programs receiving federal assistance.

Section 504 of the Rehabilitation Act, set out above, is one piece of a larger statutory structure designed to prevent invidious discrimination in federally funded programs. The section was explicitly patterned on the

---

**3.** We pretermit the question whether the remedy ordered by the district court is within the court's power. However, our holding logically implies that measures of the degree of severity

of those ordered here would only be appropriate in the most egregious circumstances. See *infra* at 1050.

seminal discrimination prohibitions of Title VI of the Civil Rights Act of 1964 [4] which prohibits discrimination on the basis of race or national origin in federally funded programs and echoes verbatim the prohibitions of Title IX of the Education Amendments of 1972 [5] against discrimination on the basis of sex in federally funded educational programs. *See* S.Rep. No. 93–1297, 93d Cong., 2d Sess., *reprinted at* [1974] U.S. Code Cong. & Ad.News 6373, 6390 ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964)"; *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277, 1280 & n. 9 (7th Cir.1977); 119 Cong.Rec. S6144–S6145 (daily ed. March 1, 1973) (remarks of Sen. Humphrey, indicating that Section 504 represented substitute for amendments to Title VI to protect the handicapped). In 1978, Congress reemphasized the identity of the prohibitions in the Rehabilitation, Comprehensive Services and Development Disabilities Amendments, Pub.L. No. 95–602. Section 120 of the Amendments, § 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2) (Supp.1983) points directly to Title VI as a model for Section 504:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section [504] of this [Act].

*See also*, S.Rep. No. 95–890, 95th Cong., 2d Sess., *reprinted at* [1978] U.S.Code Cong. & Ad.News 7312; *Community Television of Southern California v. Gottfried*, 459 U.S. 498, 103 S.Ct. 885, 892, 74 L.Ed.2d 705 (1983); *Gottfried v. FCC*, 655 F.2d 297, 312 (D.C.Cir.), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 998, 71 L.Ed.2d 292 (1981). Accordingly, when determining whether Medicaid and Medicare payments are federal financial assistance to a program or activity under Section 504, the legislative history and judicial interpretation of Title VI and Title IX of the Civil Rights Act provide appropriate and necessary guidance, *Brown v. Sibley*, 650 F.2d 760, 767–69 (5th Cir.1981),[6] particularly where, as here, we establish new rules of law that will have a significant impact on major policy issues.

*B.* Passed as part of the Civil Rights Act of 1964, Title VI had a single overriding purpose: "to make sure that the funds of the United States are not used to support racial discrimination." 110 Cong.Rec. 6544 (comments of Sen. Humphrey).[7] The statute implements this purpose by preventing service providers receiving federal funds from discriminating in programs in which individual beneficiaries of the federal aid participate.[8] Title VI binds the service provider, or "recipient," thus it affords a

---

**4.** 42 U.S.C. § 2000d *et seq.* (1981 and Supp. 1983).

**5.** 20 U.S.C. § 1681 *et seq.* (1978 and Supp.1983).

**6.** *See also North Haven Board of Education v. Bell*, 456 U.S. 512, 514, 102 S.Ct. 1912, 1914, 72 L.Ed.2d 299 (1982) (Title VI and IX); *Iron Arrow Honor Society v. Heckler*, 702 F.2d 549, 556–7 (5th Cir.1983) (Titles VI and IX).

**7.** "The taxes which support these programs are paid into the Treasury by all citizens, regardless of their race. It is simple justice that all citizens should derive equal benefits from these programs without regard to the color of their skin." 110 Cong.Rec. 6561 (1962) (comments of Sen. Kuchel). "[O]f all the provisions of this civil rights bill, none rests on so simple and so sound a principle as does Title VI. That principle is taxpayers' money, which is collected without discrimination, shall be spent without discrimination." 110 Cong.Rec. 7064 (1964) (comments of Sen. Ribicoff). *See id.* at 9111 (comments of Sen. Keating); *id.* at 7064 (comments of Sen. Pastore). *See also Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979) ("Congress wanted [in Title VI] to avoid the use of federal resources to support the discriminatory practices").

**8.** The statute directs federal agencies funding particular programs or activities to "effectuate the provisions of section 2000d of this title with respect to such program or activity" by issuing appropriate rules, regulations, or orders prohibiting discrimination by recipients. 42 U.S.C. 2000d–1. Once an agency issues its rules, regulations, and orders, "[f]ailure of a recipient to comply with such a rule, regulation, or order, may lead to termination or refusal of federal assistance." 110 Cong.Rec. 6544 (1964) (comments of Sen. Humphrey).

remedy against discrimination by recipients to *all* participants in a federally funded program,[9] not merely to the individual beneficiaries of the federal aid [10]—since eligibility for a specific type of aid is determined by criteria unrelated to the discrimination Congress sought to prevent. *Cf. University of California Regents v. Bakke,* 438 U.S. 265, 285, 98 S.Ct. 2733, 2745, 57 L.Ed.2d 750 (1978) (Powell, J.) ("The problem confronting Congress [vis-a-vis Title VI] was discrimination against Negro citizens at the hands of recipients of federal money.").

One specific area of discrimination in services provided by recipients concerning Congress at the time Title VI was passed was discrimination by hospitals and other medical facilities in the provision of health care services. *See, e.g.,* 110 Cong.Rec. 1661 (1964) (views of Sens. Lindsay, McCulloch, Cahill, Shriver, MacGregor, Mathias, Bromwell) (Title VI should counteract existing racial discrimination in "vendor payments for medical care of public assistance recipients. Hospitals, nursing homes, and clinics in all parts of the country participate in these programs...").[11]

One year after the passage of Title VI, Congress enacted Medicare and Medicaid as a means to assure that the aged, disabled, and poor would be able to secure necessary medical services. See Pub.L. No. 89–97, 79 Stat. 286. Under Medicare Part A,[12] the subject of this lawsuit, the government pays the hospital for certain in-hospital treatment for those aged and disabled persons covered by the Act. The program is financed entirely by payroll tax deductions, 42 U.S.C. § 1395 (1983), and federal payments may be made only to hospitals which meet certain conditions of participation established by the Secretary of Health and Human Services. 42 U.S.C. § 1395d(d)(2) (1983). The Medicaid program provides to state governments federal funds that the state, after establishing a federally approved plan, uses to pay for medical aid for the poor and disadvantaged. 42 U.S.C. § 1396 (1983).

Although the issue of whether Medicare and Medicaid are federal financial assistance to a program or activity of a recipient was not extensively debated when the legislation was enacted in 1965, several Senators stated that the prohibitions of Title VI would apply to recipients of Medicare and Medicaid payments. *See, e.g.,* 111 Cong. Rec. 15803 (1965) (remarks of Senator Ribicoff) (in order to receive federal payments, hospitals would have "to abide by Title VI"); 111 Cong.Rec. 15813 (1965) (comments of Sen. Hart); [13] *ibid* (comments of

---

9. Title VI requires that "the public bodies or private entities receiving the benefits of any such loan refrain from racial discrimination." 110 Cong.Rec. 6545 (1964) (comments of Sen. Humphrey).

10. *See, e.g., Bob Jones University v. Johnson,* 396 F.Supp. 597, 601 n. 15 (D.S.C.1974), aff'd, 529 F.2d 514 (4th Cir.1975):

    A "recipient" within the meaning of Title VI is not to be confused with the "beneficiary" of federal assistance. The recipient is the intermediary entity whose nondiscriminatory participation in the federally assisted program is essential to the provision of benefits to the identified class which the federal statute is designed to serve.... The requirements of Title VI cover recipients but not beneficiaries.

11. Other examples of programs that concerned Congress were educational programs, *see* 110 Cong.Rec. 1661 (1964) (statement of Rep. Lindsay *et al.*) (discrimination by schools in the operation of the school lunch program); 110 Cong.Rec. 7063 (1964) (statement of Sen. Pas-

tore) (federal impact aid to local school districts a program covered by Title VI); *see also id.* at 7065 (statement of Sen. Ribicoff); *id.* at 7101 (statement of Sen. Javits); and urban renewal payments or loans to public or private housing projects, *see* 110 Cong.Rec. 6545 (1964) (comments of Sen. Humphrey).

12. Medicare has two parts, A and B. Medicare Part A covers certain hospital services for persons 62 and over entitled to either Social Security retirement benefits under 42 U.S.C. § 402 or railroad retirement benefits based on a disability, or determined to have end stage renal disease. 42 U.S.C. §§ 1395c, 1395d.

13. We decided last year, and wrote into law, that Federal tax funds collected from all the people may not be used to provide benefits to institutions or agencies which discriminate on the grounds of race, color, or national origin. This principle will, of course, apply to hospital and extended care and home health services provided under the social security system,

Sen. Pastore).[14] No senator voiced an opposing view.

Indeed, the Medicaid legislation passed in 1965 merely expanded an existing program of federal aid to states for health care for the poor, the Kerr-Mills program, 42 U.S.C. §§ 301–306 (1964). This program was one of those cited during the passage of Title VI as being a federal program which Title VI would cover,[15] *see* 110 Cong.Rec. 13132 (# 41) (1964); *see also* 110 Cong.Rec. 1661 (1964) (comments of Reps. Lindsay, McCulloch, Cahill, Shriver, MacGregor, Mathias, and Bromwell).

As noted above,[16] the language and legislative history of the Rehabilitation Act make it abundantly clear that Congress intended the scope and effect of that statute's prohibition of discrimination on the basis of handicap to be exactly equivalent to Title VI's prohibition of discrimination on the basis of race. Moreover, the legislative history of the Medicare and Medicaid bill indicates that Congress had no doubt that these forms of federal assistance would trigger federal antidiscrimination protections.[17] Our conclusion that Congress intended Medicare and Medicaid to constitute "federal financial assistance" for the purposes of Section 504 is strengthened by a recent House Committee report:

> It has come to the Committee's attention that some uncertainty remains in some quarters as to whether or not health care facilities and other providers that participate in the Medicare and Medicaid programs are recipients of Federal financial assistance. In view of the ·Committee, it has always been clear the Medicare and Medicaid funds constitute Federal financial assistance. The Committee wishes to reaffirm that health care facilities and other providers that receive Medicare and Medicaid funds are required, under existing statutes and long-standing Department of Health and Human Services regulations and interpretations, to provide services without discrimination not

and will require institutions and agencies furnishing these services to abide by title 6 of the Civil Rights Act of 1964.
111 Cong.Rec. 15813 (1965).

**14.** The comments of Sens. Ribicoff and Pastore are of particular import because they were closely involved in the passage of both the Civil Rights Act and the health care legislation. *See* 111 Cong.Rec. 15800 (1965) (comments of Sen. Douglas) (Ribicoff's involvement in the health care bill); 110 Cong.Rec. 6528 (1964) (comments of Sen. Humphrey) (Pastore one of the floor leaders of the legislation which became Title VI). Statements of legislators so closely involved with particular legislation are "an authoritative guide to the statute's construction," *North Haven Board of Education v. Bell*, 456 U.S. 512, 527, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982), and courts should "look to [such statements] where the meaning of the statutory word is in doubt." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–395, 71 S.Ct. 745, 751–752, 95 L.Ed. 1035 (1951). *See University of California Regents v. Bakke*, 438 U.S. 265, 286, 98 S.Ct. 2733, 2746, 57 L.Ed.2d 750 (1978) (Powell, J.), 333, 335 (Brennan, Marshall, White, Blackmun, JJ.) (quoting Senator Ribicoff's comments made during the enactment of Title VI as a basis for its findings on the meaning of the Act).

**15.** These indications that Congress intended Medicare and Medicaid to trigger Section 504

and Title VI are supported by later legislative activity. In 1974, the Senate passed an amendment to legislation regarding a White House Library Conference. The amendment would have established that Medicare payments to nursing homes run by fraternal organizations like the Masons should not be regarded as federal financial assistance, thereby exempting those homes from coverage of Title VI. Although the Senate passed the amendment, 120 Cong.Rec. 39993–39994 (1974), it was eliminated in conference. *See* S.Rep. No. 1409, 93d Cong., 2d Sess. 13 (1974), 1974 U.S.C.C.A.N. 6779, 6797. When the Senate discussed the conference report, the members of the conference stated that the conferees from the Senate did not support the amendment "because of its unknown effects, other than the limited purposes for which the [sponsor] sought [sic]." 120 Cong.Rec. 41078 (1974).

The rejection of even this limited exception to coverage implicitly reiterates Congress' intent that Medicare and Medicaid arc federal financial assistance for purposes of Title VI or Section 504, since, if they were not, there would have been no need for the Senate amendment and no concern that the amendment might have implications beyond the nursing homes the sponsors sought to exempt from coverage.

**16.** See *supra* at 1042–1043.

**17.** See *supra* at 1044–1045.

just to Medicare and Medicaid beneficiaries, but to all patients.

H.R.Rep. No. 98–442, 98th Cong., 1st Sess. 77 (Oct. 26, 1983).

*C.* Those courts that have considered the issue before us have, with a single exception, interpreted the legislative intent as we do today. Only six cases have expressly considered whether Medicare and Medicaid constitute federal financial assistance to hospitals triggering Section 504 and Title VI. Five of these, including the only district court opinion to have received appellate affirmance on this point, hold that Medicare and Medicaid do indeed invoke the protections of the federal discrimination statutes. *See NAACP v. Wilmington Medical Center, Inc.,* 599 F.2d 1247, 1248 n. 4 (3d Cir.1979), *aff'd in relevant part,* 453 F.Supp. 280, later proceeding, 453 F.Supp. 330 (D.Del.1978), (affirming district court determination that hospital's receipt of Medicare, Medicaid and unspecified "other" assistance triggered Section 504 and Title VI); *United States v. University Hospital of SUNY at Stony Brook,* 575 F.Supp. 607 (EDNY 1983), *aff'd on other grounds,* 729 F.2d 144 (2d Cir.1984) (legislative history reveals Medicare and Medicaid are "federal financial assistance for purposes of § 504"); *United States v. Cabrini Medical Center,* 497 F.Supp. 95, 96 n. 1 (SDNY 1980), *rev'd on other grounds,* 639 F.2d 908 (2d Cir.1981) (same); *Cook v. Ochsner Foundation Hospital,* Civ. No. 70–1969 (E.D.La. February 12, 1979) (same); *Bob Jones University v. Johnson,* 396 F.Supp. 597, 603 n. 21 (D.S.C.1974), *aff'd without opinion,* 529 F.2d 514 (4th Cir.1975) (district court finds Medicare and Medicaid to be federal financial assistance for Title VI purposes); *see also Bernard B. v. Blue Cross and Blue Shield,* 528 F.Supp. 125, 132 (SDNY 1981), *aff'd without opinion,* 679 F.2d 7 (2d Cir.1982) (district court assumes that Medicare constitutes "federal financial assistance" in holding that if Medicare linked to discriminatory program plaintiffs may state a Section 504 case); *Flora v. Moore,* 461 F.Supp. 1104, 1115 (N.D.Miss.1978) (stating in dicta that Medicare and Medicaid invoke Title VI protection); *but contra Trageser v. Libbie Rehabilitation Center, Inc.,* 462 F.Supp. 424 (E.D.Va.1977), *aff'd on other grounds,* 590 F.2d 87 (4th Cir.1978),[18] *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979).

Heavier artillery, though not directly on target, is the Supreme Court's recent decision in *Grove City College v. Bell,* —— U.S. ——, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In *Grove City,* the Court relied predominantly on Congressional exchanges in debate to hold that a college's receipt of Basic Educational Opportunity Grants (BEOGs) —federal grants extended to college students for college expenses—requires the college to comply with Title IX of the Education Amendments of 1972, 20 U.S.C. 1681(a). Title IX prohibits sex discrimination in "any education program or activity receiving federal financial assistance." The Court noted that Congress enacted both Title IX and the BEOG program in the same bill and that the debate engendered several express references to the bill's attempt to prevent discrimination in student aid programs. The Court held that "it would indeed be anamalous" to suppose that a Congress so concerned over discrimination in student aid did not intend the federal student aid program it was then enacting to trigger a contemporaneous federal law reaching sex discrimination in education. —— U.S. at ——, 104 S.Ct. at 1217.

---

**18.** The Fourth Circuit's opinion appears to reject the notion that the nursing home in question did not receive federal financial assistance:

> The distinction that § 120(a) draws between the relief available to federal employees and that available to employees of private institutions *receiving federal assistance* could not have been inadvertent.

590 F.2d at 89 (emphasis added).

The fallacy of the district court's reasoning in *Trageser* is underscored by the fact that in *University of Richmond v. Bell,* 543 F.Supp. 321 (E.D.Va.1982), the district court relied on the district court opinion in *Trageser* to find that BEOGs did not trigger Title IX, *see* 543 F.Supp. at 320—a holding expressly overruled by the *Supreme Court in Grove City College v. Bell,* —— U.S. ——, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

In reaching its conclusion, the Court specifically recognized that Title IX must be interpreted as part of a broad government policy, of which Title VI is the keystone, to prevent discrimination in programs receiving federal assistance:

Title IX was patterned after Title VI of the Civil Rights Act of 1964, Pub.L. 88–352, 78 Stat. 252, 42 U.S.C. §§ 2000d *et seq.* (1976 and Supp. V). *Cannon v. University of Chicago,* 441 U.S. 677, 684–685, 99 S.Ct. 1946, 1951, 60 L.Ed.2d 560 (1979); 118 Cong.Rec. 5807 (1972) (Sen. Bayh). The drafters of Title VI envisioned that the receipt of student aid funds would trigger coverage, and, since they approved identical language, we discern no reason to believe that the Congressmen who voted for Title IX intended a different result.

—— U.S. at ——, 104 S.Ct. at 1218 (footnote omitted).

Similarly in this case, Congressional discussion in 1965 regarding Medicare and Medicaid demonstrates Congress' intent that those payments invoke Title VI coverage—and, therefore, Section 504 coverage.[19] As with BEOGs, an individual is eligible for Medicare and Medicaid payments only if the recipient (here, the hospital) participates in the Medicare or Medicaid programs.

*D.* Courts engaging in precedential analysis of statutes, as we do here, must "accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). Agency regulations implementing Section 504 and Title VI reaffirm our conclusion. The Department of Health, Education and Welfare (the predecessor to the Department of Health and Human Services) expressly included Medicare and Medicaid as programs covered by Title VI, *see* 38 Fed.Reg. 17982 (1973); 40 Fed.Reg. 18173 (1975), and HHS's regulations continue to

list these programs among those covered by Title VI. *See* 45 C.F.R. Part 80, Appendix A at Part 1, # 121 and Part 2, # 30. The Department's regulations implementing Section 504 expressly state that service providers whose only source of federal financial assistance is Medicaid "should be regarded as recipients under the statute and the regulation and should be held individually responsible for administering services in a non-discriminatory fashion." 45 C.F.R. Part 84, App. A, Subpart A(1). (source: 42 Fed.Reg. 22677 (1977)). Just as the language of Section 504 itself tracks that of Title VI, so the definitions of pertinent terms in the regulations under Section 504 substantially echo those under Title VI.[20]

*E.* Baylor's several arguments in opposition seek to distinguish between federal aid granted directly to an institution and federal aid received by an institution by virtue of the participation of individual beneficiaries in federal programs. Although these do not lack force, we conclude that the considerations voiced by us above and the general thrust of *Grove City* foreclose them. For example, Baylor argues that the antidiscrimination statutes recognize a distinction between direct institutional assistance and aid received through individual beneficiaries; that federal assistance tied to a federal requirement that it be used to pay for participation in a specific type of program is analogous to general-purpose governmental assistance such as food stamps or disability pay (which do not trigger the statutes), and that the coverage of the statutes does not extend to the program as a whole, but is limited to the individual beneficiaries of the particular federal aid. In *Grove City,* the Supreme Court looked to the legislative history of Title VI to reject identical arguments made by the college in the context of BEOGs and Title VI, *see* —— U.S. at ——, 104 S.Ct. at 1217 (rejecting distinction between direct

---

**19.** See *supra* at 1044–1045.

**20.** *Compare, e.g.,* 45 C.F.R. § 84.3(h) (definition of "federal financial assistance" under § 504)

*with* 45 C.F.R. § 80.13(f) (definition of "federal financial assistance" under Title VI).

and indirect assistance); *id.* at note 13 (rejecting analogy between BEOGs and general purpose aid); *id.* —— U.S. at ——, 104 S.Ct. at 1221, note 21 (rejecting restricting coverage to beneficiaries only). The Court's course of reasoning compels us similarly to reject these arguments in the context of the Rehabilitation Act.[21] We also reject as frivolous Baylor's argument that Medicare and Medicaid are exempt from the statutory scheme because payment occurs after treatment. Quite simply, the nature of hospital services requires payment after they are rendered, when costs can be calculated.

One further argument made by Baylor merits our brief attention. Baylor argues that Medicare and Medicaid are insurance programs and thus exempt from the coverage of Title VI and Section 504. While it is true that Title VI excludes from coverage a federal "contract of insurance or guaranty"[22] we conclude that this exception does not prevent Medicare or Medicaid from triggering Section 504. We observe first that the Rehabilitation Act, unlike Title VI, contains no such exclusion. Assuming,

however, that this exception implicitly applies to Section 504,[23] neither Medicare nor Medicaid is the type of contractual program Congress intended to exempt.

As the legislative history makes abundantly clear[24], in excluding "contracts of insurance or guaranty" from Title VI, Congress intended to prevent Title VI from reaching individually owned homes financed with federally guaranteed mortgages, or individual bank accounts in a bank with federally guaranteed deposits. In other words, Congress did not want Title VI to effect a nationwide Fair Housing Act.

Although the Medicare title of the Social Security Act is "Health Insurance for the Aged and Disabled," comments during the debate reveal that legislators used the term in the sense of "social insurance"; the bill is described as "social insurance," "social legislation," or "assistance for the elderly."[25] More fundamentally, the mandatory nature of coverage and the financing of the program through mandatory payroll taxes distinguishes it from the voluntary, individually-financed agreements Congress intended to exempt.[26]

21. Two additional arguments bolster our rejection of Baylor's contention that HHS may not ground a review on complaints received from a non-beneficiary of Medicare or Medicaid. First and most important, Section 504 by its explicit language bars discrimination against any handicapped person who is a *participant* in a federally assisted *program*—not only direct beneficiaries of the federal assistance. Moreover, HHS need have received no complaint at all to review whether a recipient is discriminating, see 45 C.F.R. 94.61, 80.7.

22. Title VI states "Each federal department and agency which is empowered to extend federal financial assistance to any program or activity by way of grant, loan, or contract other than a contract of insurance or guaranty, \* \* \*." 42 U.S.C. 2000d–1. *See also* 42 U.S.C. 2000d–4.

23. *See* 45 C.F.R. § 84.3(h) (excepting "contracts of insurance or guaranty" from Section 504: *see also* 45 C.F.R. App. A, Subpart A, commenting on § 84.3(h):

"The proposed regulation's exemption of contracts of insurance or guaranty has been retained. A number of comments argued for its deletion on the ground that section 504, unlike title VI and title IX, contains no statutory exemption for such contracts. There is no indication, however, in the legislative his-

tory of the Rehabilitation Act of 1973 or of the amendments to that Act in 1974, that Congress intended section 504 to have a broader application, in terms of federal financial assistance, than other civil rights statutes. Indeed, Congress directed that section 504 be implemented in the same manner as titles VI and IX. In view of the long established exemption of contracts of insurance or guaranty under title VI, we think it unlikely that Congress intended section 504 to apply to such contracts."

24. See 110 Cong.Rec. 2500 (1964) (comments of Rep. Celler); *id.* at 6545 (comments of Sen. Humphrey); *id.* at 6566 (analysis of House-passed version); *id.* at 9090 (comments of Sen. Gore); *id.* at 12878 (comments of Sen. Stennis); *id.* at 13378 (comments of Sen. Humphrey).

25. See 111 Cong.Rec. 7228 (1965) (comments of Rep. King); *id.* at 7355 (comments of Rep. Farbstein); *id.* at 15630 (comments of Sen. Anderson); *id.* at 15836 (comments of Sen. Kennedy); *id.* at 15882, 18513 (comments of Sen. Fong).

26. The Attorney General's letter regarding Title VI mentioned other "contract of insurance" programs the government operated, such as Federal crop insurance or Federal employees' life

Additionally, the Supreme Court's holding in *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), that Social Security benefits are not contractual interests and do not create property rights in the beneficiary because of the nature of the funding system, 363 U.S. at 610, 80 S.Ct. at 1372, compels finding no "contract" in Medicare Part A, which uses the same funding system as the social security disability program at issue in *Flemming*.[27]

Nor may Medicaid be considered a federal "contract of insurance" program. Federal assistance under Medicaid goes to a state which contributes funds and administers the program for health care for the poor and disadvantaged. Called "assistance" during the debates and in the statutes, Medicaid is in no way comparable to an insurance program, but closely resembles in its financial structure such prominent Title VI programs as the school lunch program, 42 U.S.C. §§ 1751–64 (1964), and the Hill-Burton Program for hospital construction, 42 U.S.C. § 291 (1964), in which

federal assistance given to the states was distributed by the states to local school districts or hospital construction projects.[28]

Our consideration of Baylor's arguments strengthens our conclusion: Baylor's receipt of Medicare and Medicaid payments subjects it to appropriate federal action under Section 504 of the Rehabilitation Act.

II.

■ Section 504 prohibits discrimination based on handicap in any "program or activity" receiving federal financial assistance. Under Title VI provisions expressly applicable to Section 504,[29] the scope of HHS investigations and corrective actions is limited to actions by recipients taken under or which may affect those of the recipient's programs or activities that get federal financial assistance. *See North Haven Board of Education v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (Title IX agency action must be program-specific), *Grove City*, — U.S. at ——, 104 S.Ct. at 1219, (same). Baylor

insurance. These programs, unlike Medicare or Medicaid, involved individual contracts between the government and the covered individual. *See Rainbow Citrus Corp. v. Federal Crop Ins. Corp.*, 506 F.2d 467, 468 (9th Cir.1974) (description of the federal crop insurance program which authorized the government to enter into individual contracts with certain growers).

Congress rejected a proposal to replace the Medicare legislation ultimately enacted with a scheme under which coverage would be wholly voluntary and financed through premiums alone—an alternative closely patterned after private insurance plans. *See* Cong.Rec. 7220 (1965) (comments of Rep. Byrnes, sponsor of the alternative proposal.

27. The Court's explanation of the noncontractual nature of the benefits at issue in *Flemming* might be applied almost verbatim here:

The Social Security system may be accurately described as a form of social insurance, enacted pursuant to Congress' power to "spend money in aid of the 'general welfare,'" *Helvering v. Davis, supra*, [301 U.S. 619] at 640 [57 S.Ct. 904 at 908, 81 L.Ed. 1307], whereby persons gainfully employed, and those who employ them, are taxed to permit the payment of benefits to the retired and disabled, and their dependents. Plainly the expectation is that many members of the present productive work force will in turn become beneficiaries rather than supporters of the program.

But each worker's benefits, though flowing from the contributions he made to the national economy while actively employed, are not dependent on the degree to which he was called upon to support the system by taxation. It is apparent that the noncontractual interest of an employee covered by the Act cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments.

*Flemming*, 363 U.S. at 609–10, 80 S.Ct. at 1372.

28. See, *e.g.*, discussion of school lunch program at 110 Cong.Rec. 2487 (1964) (comments of Rep. Celler), *id.* at 6545 (comments of Sen. Humphrey), *id.* at 7101 (comments of Sen. Javits); discussion of Hill-Burton Act, *id.* at 1661 (statement of Rep. Lindsay, et al.), *id.* at 6544 (comments of Sen. Humphrey), *id.* at 7063 (comments of Sen. Pastore), *id.* at S. 13376 (comments of Sen. Alcott).

29. Title VI "authorize[s] and direct[s]"

"[e]ach Federal department and agency ... empowered to extend Federal financial assistance to any program or activity ... to effectuate [the antidiscrimination provisions of the statute] with respect to such program or activity ... consistent with achievement of the objectives of the statute authorizing the financial assistance ...."

42 U.S.C. 2000d–1.

argues that the district court did not specify for HHS scrutiny a "program" receiving Medicare and Medicaid, as Section 504 requires, but authorized complete investigation of the hospital as an institution.

However, we find no fault with the district court's holding that HHS may investigate Baylor's policies for handicapped patients receiving inpatient and emergency room services. A brief reference to the Medicare statute and to Baylor's own accounting statements demonstrates that Baylor's inpatient and emergency room services are the programs receiving this federal assistance and may thus be proper subjects for HHS investigation. The Medicare statute specifically mentions inpatient and emergency room services among those covered by the Act. *See, e.g.,* 42 U.S.C. §§ 1395c, 1395d, 1395f(d)(1). Also, while a recipient's bookkeeping practices may not be dispositive on the issue of which of its programs receive particular federal funds, *see Grove City,* 104 S.Ct. at 1219–22, Baylor's own records confirm that its inpatient and emergency room services receive Medicare and Medicaid funding.[30] Accordingly, the investigation authorized was properly "program specific."

### III.

■ We turn last to the appropriateness of the remedial order imposed by the district court. Having found Baylor in violation of Section 504 in refusing to provide HHS with the requested information and access, the district court ordered all future Medicare and Medicaid payments to the hospital suspended "for as long as" Baylor continues to deny HHS access. This immediate termination of benefits stands in contrast to the administrative remedy provided by statute, under which the agency must file a report with Congress and thirty days must thereafter elapse before termination of funds or other sanction is imposed. 42 U.S.C. § 2000d–1. We find the thirty-day waiting period provided by statute indicative of Congressional intent that service providers be granted a grace period for compliance in order to avoid punishing the beneficiaries of the federal aid for the errors of service providers by abruptly depriving the providers, and hence the individual beneficiaries, of the federal aid in question. In failing adequately to consider this legislative intent in the context of the particular circumstances, we conclude that the district court abused its discretion here.

We do not mean to imply that a federal agency seeking to enforce antidiscrimination provisions of Section 504 must resort to administrative remedies. The statute expressly states otherwise: an agency may resort to "any other means authorized by law"—including the federal courts. *See, e.g., United States v. Marion County School District,* 625 F.2d 607 (5th Cir. 1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981) (HEW permitted to sue to enforce school district's compliance agreement under Title VI). Nor do we mean to suggest that a court in the position of the district court here may not grant a remedy other than that envisioned in the context of administrative proceedings. We hold simply that the district court abused its discretion in not considering Congress' intent to cushion beneficiaries from the immediate deprivation of benefits. Moreover, we do not discern here those egregious circumstances that might warrant the imposition of a remedy as harsh as that imposed by the district court. Accordingly, we vacate the order and grant Baylor thirty days after that on which our mandate issues to comply with HHS's request; if it does not do so as of that time, we direct the immediate suspension of all future Medicare and Medicaid funds to the hospital's inpatient and emergency room services.

The order below is

AFFIRMED IN PART; VACATED AND MODIFIED IN PART.

---

**30.** See note 2 *supra.* (Medicare) Baylor also concedes that it receives Medicaid payments. These payments may also be made for inpatient and emergency services for beneficiaries, see 42 U.S.C. § 1396d(a)(1). While Medicaid may support a wider range of services than Medicare, the HHS investigation authorized is well within the area covered by both forms of assistance.