Gene H. ARLINE, Plaintiff-Appellant;

v.

The SCHOOL BOARD OF NASSAU COUNTY; and Craig Marsh, Individually and as Superintendent of Schools of Nassau County, FL, Defendants-Appellees.

Gene H. ARLINE, Plaintiff-Appellee,

v.

The SCHOOL BOARD OF NASSAU COUNTY; and Craig Marsh, Individually and as Superintendent of Schools of Nassau County, FL, Defendants-Appellants.

Nos. 83-3754, 84-3307.

United States Court of Appeals, Eleventh Circuit.

Sept. 30, 1985.

Steven H. Malone, St. Petersburg, Fla., for Gene H. Arline.

Brian T. Hayes, Monticello, Fla., for School Bd. of Nassau County et al.

Before VANCE and ANDERSON, Circuit Judges, and HENLEY *, Senior Circuit Judge.

VANCE, Circuit Judge:

In enacting the Rehabilitation Act of 1973, Congress designed a comprehensive federal program aimed at integrating the handicapped into this society and affording them greater access to its benefits. One of the enforcement mechanisms of that Act is the private right of action[1] which arises out of its antidiscrimination provision. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that:

> No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

In the appeal before us the plaintiff, a third grade teacher who was fired from her job solely because of her susceptibility to tuberculosis, alleges that her dismissal violated section 504. Our consideration of her claim requires us to construe the meaning of three essential terms in section 504, namely, "handicapped individual," "otherwise qualified"[2] and "federal financial assistance."

### I

Mrs. Gene Arline first contracted tuberculosis in 1957 at the age of fourteen, after which the disease went into remission. In 1966 she was hired as an elementary school teacher in Nassau County, Florida, and did her job competently for thirteen years. Arline then suffered three relapses of tuberculosis, one in 1977 and two in 1978. After her third relapse, the School Board dismissed Arline from her job.

After being denied relief in state administrative proceedings, Arline brought suit in federal court alleging that her dismissal constituted a violation of section 504 of the Rehabilitation Act.[3] She contended that

---

* Honorable J. Smith Henley, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. This court has concluded that section 504 creates a private right of action. *Jones v. Metropolitan Atlanta Rapid Transit Authority,* 681 F.2d 1376, 1377 n. 1 (11th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984).

2. The regulations promulgated under section 504 have limited the broad scope of the phrase "otherwise qualified" to cover handicapped persons who would be qualified for a specific job if given "reasonable accommodation" by the employer. *See* 45 C.F.R. § 84.3(k)(1). For further discussion, see part IV *infra.*

3. The plaintiff also brought a claim under 42 U.S.C. § 1983, alleging that she was denied due process under the fourteenth amendment. We reject this argument on the grounds articulated by the district court in its oral opinion:

> The plaintiff had at least one hearing and then a second hearing before the school board, then had a hearing before the Board of Education, State Board of Education, and

her susceptibility to tuberculosis made her a "handicapped individual" within the meaning of the Rehabilitation Act, and that the school board therefore violated section 504 because it had fired her even though she was "otherwise qualified if given reasonable accommodation." Arline's first theory was that her handicap created no barrier at all to her continued employment because the risk that she would infect her students was so minimal. The decision to dismiss her because of it was thus unreasonable and discriminatory. In the alternative, she claimed that even if nonsusceptibility to tuberculosis was a necessary physical qualification for teaching small children, the school district should have offered her "reasonable accommodation" in the form of an administrative job or a temporary position teaching less susceptible persons such as older students or adults until she could obtain certification in areas outside elementary education.[4]

Along with medical evidence to support her claims, Arline introduced evidence that the school system received two forms of federal assistance. The first source of federal funds was Title I of the Elementary and Secondary Education Act, 20 U.S.C. §§ 2701–2854,[5] which provided monies to schools attended by significant numbers of children from low-income families. Although those funds were segregated from the general budget and used to pay only Title I teachers' salaries and purchase only Title I program supplies, she pointed out that her job entailed significant involvement with the Title I program in the form of day-to-day conferrals with Title I teachers about those of her students who were involved in the program. The second form of federal funding was "impact aid," which is provided to school systems whose populations have been substantially enlarged by the attendance of federal employees' children, but which have reduced tax revenues due to the presence of federally-owned property in the district. 20 U.S.C. § 237. Although such funds constituted only a small portion of the school system's budget,[6] the defendants conceded that it was added to the school system's general education fund, from which teachers' salaries were paid.

After trial, the district court issued an oral opinion which found for the defendants on all counts. First, the court found that a contagious disease such as tuberculosis is not a "handicap" within the meaning of the Rehabilitation Act. As to her contention that she should have been given another position, the court concluded that Arline lacked the qualifications to teach outside of elementary education. In any case, the court held, the school board had no obligation to afford Arline alternative positions because it had an overriding duty to protect the public from contagious diseases.[7] Finally, the court concluded that

---

then the matter was appealed pursuant to the administrative practices act of the State of Florida, chapter 120 of the Florida Statute, and the First District Court of Appeal ruled against her. In doing so, the Court of Appeal discussed the contract issue that was involved there and gave an interpretation of the contract provision, which provided that ... the contract was continuing unless the individual who had executed the contract was unable to perform duties because of illness.

.... I see no denial of due process, either procedural or substantive with regard to that decision or the action of the school board of Nassau County in that respect.

4. The district court found that the school board had a policy which permitted an individual to work out of field or out of certification for a period of time while he was attempting to obtain certification in that field.

5. The Title I program has now been superseded by Chapter 1 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. §§ 3801–3876.

6. Testimony by the school board's superintendent established that in 1978–79 the system received $39,000 in impact aid, or approximately 0.3 percent of the entire school budget.

7. The court did not make clear whether it believed that the absence of such an obligation on the part of the school board resulted from its conclusion that tuberculosis is not a handicap; or whether, assuming that tuberculosis is a handicap, her susceptibility to it precluded Arline from being a person "otherwise qualified" for any teaching position; or finally, whether the school board's duty to afford "reasonable accommodation" did not extend to affording the relief she requested.

neither the Title I funding nor the impact aid met the "federal financial assistance" requirement of section 504. With regard to the Title I money, the court stated that Arline was not a beneficiary of the funds because she was "not employed for purposes of Title I or in the Title I program...." As for the impact aid, the court concluded that it did not constitute "federal financial assistance" within the meaning of section 504.

## II

Because of its jurisdictional implications, we first consider whether the defendant received any "federal financial assistance" within the meaning of section 504. We need not address the effect of the Title I funding, for we find that the impact aid given to the defendants qualifies as "federal financial assistance" under section 504.

 As this court noted in *Jones v. Metropolitan Atlanta Rapid Transit Authority,* 681 F.2d 1376, 1379 (11th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984), "[o]n its face ... [section 504] applies to programs receiving federal financial aid *of any kind*" (emphasis supplied).[8] *See also Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, —, 104 S.Ct. 1248, 1253, 79 L.Ed.2d 568 (1984). Where the language of a statute is not ambiguous and does not lead to absurd results, the job of the courts is to apply it as written.

 The court below concluded and the defendants now contend, however, that the application of the statute is not so straightforward as its language would suggest. First, they find ambiguity in the term "federal financial assistance," and argue that the nature of federal impact aid is such that it could not have been within Congress' contemplation as a means of triggering the enforcement provision in section 504. Defendants' rationale is that impact aid is, as a matter of definition, not "assistance." They posit that it is more analogous to land taxes than to federal assistance since it is calculated on the basis of federal ownership of land and serves as a substitute for tax payments that the school system would receive had the land in its area been privately owned. We agree that when the federal government makes payments for obligations incurred as a market participant such payments do not constitute "federal assistance." *See, e.g., Hingson v. Pacific Southwest Airlines,* 743 F.2d 1408, 1414 (9th Cir.1984) (payments under contracts to carry mail); *Jacobson v. Delta Airlines,* 742 F.2d 1202, 1209 (9th Cir.1984) (same), *cert. dismissed,* — U.S. —, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985). *See also Darrone,* 465 U.S. at —, 104 S.Ct. at 1256 n. 19. We must, however, reject the defendants' analogies to obligatory tax payments as fatally flawed. The indisputable fact is that the federal government's exemption from local taxes left it with no legal obligation to give impact aid. Its choice to assist local entities that happen to bear particularly heavy burdens because of this exemption renders its assistance no less a subsidy than any other form of aid that it dispenses. As such, it is federal financial assistance within the broad meaning that Congress intentionally gave the term in section 504.[9]

---

**8.** Congress' failure to limit the scope of section 504 with any qualifying language was not an oversight, as evidenced by the contrast between that provision and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–1 to –6, an analogous civil rights statute which Congress clearly had in mind during the passage of the Rehabilitation Act and its amendments. *See* S.Rep. No. 1297, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6390. Title VI prohibits race discrimination in employment. Section 604 of Title VI, 42 U.S.C. § 2000d–3, limits the enforcement of anti-race discrimination provisions of Section 601 to those situations in which "a primary objective of the Federal financial assistance is to provide employment." Section 504 includes neither the "primary objective" limitation nor any other. *See Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, —, 104 S.Ct. 1248, 1253–54 (1984). We would be acting beyond our authority to read into section 504 limitations which Congress chose not to establish when it clearly could have done so.

**9.** As the fifth circuit recently explained in its exhaustive analysis of the legislative history of both section 504 and the analogous civil rights

We also find no merit in defendants' argument that the plaintiff failed to show that the impact aid funded a "program or activity" in which she was employed. Under their theory, it was not sufficient for plaintiff to show that the impact funds were non-earmarked monies which were deposited into the school board's general revenue fund to be used as it saw fit and that her salary was paid out of that fund. They argue that she must also show that the impact monies were actually used to fund her salary, since "the School Board might have elected to use those funds to pay for a program which would have had to be eliminated if the impact funds had been cut off." This argument strains credulity. Such a theory would impose on the plaintiff the impossible burden of tracing money that is virtually untraceable under accounting procedures which commingle funds in a general account before outlays are made. It also misconceives the relevant "program" in this case. We hold that the relevant "program" with regard to these non-

earmarked general revenue funds is the entire school system. Once the federal money was deposited into its general fund, all activities paid for out of that fund became subject to section 504.

## III

We must next determine whether tuberculosis constitutes a "handicap" within the meaning of the Rehabilitation Act. The district court concluded that it did not, explaining that "it's difficult for this court to conceive that Congress intended contagious diseases to be included within the definition of a handicapped person...." We look first to the language of the statute in deciding whether the court has given a proper construction to the term.[10] Second, we take guidance from the construction given by the agency entrusted with the statute's enforcement. Regulations promulgated by the Department of Health and Human Services, 45 C.F.R. § 84.3, give further definition to all of the relevant terms of section 504.[11]

statutes expressly incorporated by it, Congress' "single overriding purpose" was to ensure that the funds of the United States were not used to support discriminatory practices. *United States v. Baylor University Medical Center,* 736 F.2d 1039, 1042–43 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985). To this end, Congress intentionally gave broad scope to the term "federal financial assistance" in section 504. As this court pointed out in *Jones,* "the legislative history to the 1974 amendments is replete with notations indicating that Section 504 was intended to encompass programs receiving federal financial assistance of any kind...." 681 F.2d at 1379–80. Recognizing the overall goal involved, the Supreme Court has rejected attempts to read limitations into the term which are not apparent on the face of section 504. *Darrone,* 465 U.S. at ——, 104 S.Ct. at 1253–55. *See also Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (interpreting "federal financial assistance" under Title IX). We too conclude that since impact aid does not fall within any specifically delineated exception to the statute, it must be defined as "federal financial assistance" in order to give effect to the broad legislative intent expressed in section 504.

10. 29 U.S.C. § 706(7)(B) states that:
 Subject to the second sentence of this subparagraph, the term "handicapped individual" means ... any individual who (i) has a physical or mental impairment which substantially

limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of sections 793 and 794 of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

11. 45 C.F.R. § 84.3(j)(2) provides:
 (i) "Physical or mental impairment" means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
 (ii) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
 (iii) "Has a record of such an impairment" means has a history of, or has been misclassi-

■ The language of these provisions in every respect supports a conclusion that persons with contagious diseases are within the coverage of section 504. As the record in this case makes clear, a person with tuberculosis is, when afflicted with the disease, one who "has a physical or mental impairment which substantially limits ... major life activities," 29 U.S.C. § 706(7)(B); 45 C.F.R. § 84.3(j)(2)(i)(A), since the disease can significantly impair respiratory functions as well as other major body systems. Even when not directly affected by tuberculosis, Arline falls within the coverage of section 504 because she "has a record of such an impairment," 45 U.S.C. § 84.3(j)(2)(iii), and "is regarded as having such an impairment," 45 U.S.C. § 84.4(j)(2)(iv), by her employer. When a fact pattern falls so neatly within the statutory and regulatory framework, and when coverage would so clearly serve to promote Congress' intent to reduce instances of unthinking and unnecessary discrimination against those who are the focus of the statute's concern, we would be hard pressed to find an exemption without further legislative direction.

As far as we can tell, there is no such legislative direction. Though the district court apparently thought it illogical to conclude that Congress would have placed contagious diseases within the definition of "handicaps," there is no objective evidence to support this conclusion. Neither the regulations nor the statutory language give any indication that chronic contagious diseases are to be excluded from the definition of "handicap." To the extent that the statute and regulations express any intent to limit the scope of section 504, Congress' failure to exclude contagious diseases from coverage when it specifically excluded alcoholism and drug abuse implies that it harbored no similar disapproval about them.

We would as a general matter be reluctant to create an exemption where there is not a scintilla of evidence that Congress had any intention of doing so. We are especially reluctant in a situation where, as here, identifying an exemption would free recipients of federal funds from any duty even to consider whether reasonable accommodation could be made to those afflicted with contagious diseases. Such a result would, in our view, subvert Congress' intent to encourage recipients of federal funds to make decisions about the employability of those with physical or mental impairments only after a careful and informed weighing of the costs involved in accommodating the tasks at issue to their capabilities. This case, we believe, is precisely the kind in which that weighing process should have been made. We turn next to the district court's conclusion that the school board did in fact give Arline proper consideration.

**IV**

■ The law has recognized that not every handicapped individual can be integrated into every aspect of society in a cost-efficient manner. The regulations promulgated pursuant to section 504 therefore limit its applicability to situations where the handicapped individual would be "otherwise qualified" if given "reasonable accommodation." *See Southeastern Community College v. Davis*, 442 U.S. 397, 410–13, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979); 45 C.F.R. §§ 84.3(k)(1), 84.12. While legitimate physical qualifications may be essential to the performance of certain jobs, *see* 442 U.S. at 406–07, 99 S.Ct. at 2367, both that determination and the determination of whether accommodation is possible are fact-specific issues. The court is obligated to scrutinize the evidence before determining whether the

fied as having, a mental or physical impairment that substantially limits one or more major life activities.

(iv) "Is regarded as having an impairment" means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a

physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) has none of the impairments defined in paragraph (j)(2)(i) of this section but is treated by a recipient as having such an impairment.

defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice. *See, e.g., Strathie v. Department of Transportation,* 716 F.2d 227 (3d Cir.1983); *New York State Association for Retarded Children v. Carey,* 612 F.2d 644 (2d Cir. 1979). In this case, the district court made no findings resolving the numerous factual disputes as to whether the risks entailed in retaining Arline in her elementary school position precluded her from having the necessary physical qualifications for the job, whether the same would be true if she were transferred to a position teaching less susceptible individuals, or whether the costs involved in accommodating her would place undue burdens on the school system.[12] Rather, it simply concluded that the school board was exempt from any duty whatever to weigh the actual costs and risks involved in accommodating Arline because of an overriding "duty to the public it serves." Section 504 by its existence establishes that such a duty cannot be used to shield an entity from liability for making decisions which "arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program." *Southeastern Community College,* 442 U.S. at 412, 99 S.Ct. at 2370. We therefore remand this case for further findings [13] as to whether the risks of infection precluded Mrs. Arline from being "otherwise qualified" for her job and if so whether it was possible to make some reasonable accommodation for her in that teaching position, in another position teaching less sus-

ceptible individuals, or in some other kind of position in the school system.[14]

REVERSED and REMANDED.

---

**12.** We recognize that the outcome in this case, as in Title VII cases, may depend on the allocation of burdens of persuasion or production. *See Doe v. New York University,* 666 F.2d 761, 776–77 (2d Cir.1981); *Prewitt v. United States Postal Service,* 662 F.2d 292, 307–10 (5th Cir. Unit A 1981). Because neither party has briefed this issue, however, we decline to address it.

**13.** The court may at its option hold further evidentiary hearings if it deems them necessary.

*See also* 29 C.F.R. § 1613.704 (discussing factors for consideration in determining "reasonable accomodation"); *Prewitt,* 662 F.2d at 309 (same).

**14.** Defendants' cross-appeal alleges error in the court's refusal to grant them attorneys' fees as prevailing parties under 29 U.S.C. § 794a(b). We affirm this aspect of the court's holding.