United States Court of Appeals,

Fifth Circuit.

No. 91–1552.

UNITED STATES of America, Plaintiff–Appellant Cross–Appellee,

v.

HARRIS METHODIST FORT WORTH, Defendant–Appellee Cross–Appellant.

Sept. 1, 1992.

Appeals from the United States District Court for the Northern District of Texas.

Before WISDOM, JONES, and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Department of Health and Human Services (HHS) appeals from a ruling that a proposed Title VI compliance review of physician staff privileges at Harris Methodist Hospital–Fort Worth was a warrantless search that did not comport with Fourth Amendment standards of reasonableness. Harris Methodist cross-appeals the trial court's ruling that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* applies to physician staff privileges. We affirm, albeit on different reasoning from that of the district court.

BACKGROUND

Harris Methodist in Fort Worth, Texas, is one of 500 to 600 hospitals in Region VI of HHS. In August 1986, HHS notified Harris Methodist that it was targeted for an investigation of the hospital's physician staff privileges and peer review processes. HHS asserted that the investigation was authorized by Title VI. HHS appended an expansive request for information to the original notification of the investigation, including all documents and the names and ethnic identities of all persons associated with the granting of physician staff privileges at Harris Methodist. The pertinent parts of the investigation request are appended to this opinion.

Opposed to the extensive scope of the requested materials, Harris Methodist officials sought

meetings with HHS representatives. When these were unsuccessful, Harris Methodist refused to permit HHS investigators access to the information. Finally, in May 1989, HHS filed suit seeking declaratory relief against Harris Methodist. A bench trial was held on March 18, 1991, at which time the trial court ruled in favor of Harris Methodist, concluding that the proposed compliance review was an impermissible warrantless search.

The trial court held that Title VI applies to physician staff privileges, prohibiting discrimination in granting or denying staff privileges at a hospital receiving federal funds. However, the court also barred execution of the proposed HHS compliance investigation as an unconstitutional warrantless search. The court found the proposed search to be unreasonable because Harris Methodist was selected for a compliance investigation on the basis of the unreviewed discretion of the HHS regional director. The court also found that the director's decision was entirely arbitrary and was not based on meaningful criteria. The court further ruled that Harris Methodist had not consented to the administrative search.

On appeal, HHS argues that Harris Methodist consented to an administrative search by executing compliance assurance documents tied to federal construction loans under the Hill–Burton Act and receipt of continuing Medicare/Medicaid funding. HHS asserts that Fourth Amendment reasonableness requirements are therefore inapplicable. As cross-appellant, Harris Methodist challenges the applicability of Title VI to physician staff privileges. As a further ground for affirming the trial court's ruling, Harris Methodist urges that peer review materials are protected from disclosure by an evidentiary privilege.

## APPLICABILITY OF TITLE VI

Enacted as part of the Civil Rights Act of 1964, § 601 of Title VI, 42 U.S.C. § 2000d states a broad prohibition of the use of federal funds to aid discrimination:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The next two provisions of Title VI, §§ 2000d–1 and –2, authorize federal agencies to ensure compliance with the non-discrimination policy and, in the worst cases, to withdraw federal funds from a violator. The penultimate provision, § 604, 42 U.S.C. § 2000d–3, qualifies the policy:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except when a primary objective of the federal financial assistance is to provide employment.

Section 604 appears to dovetail with the contemporaneously enacted Title VII of the Civil Rights Act. *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 632–33, 104 S.Ct. 1248, 1254, 79 L.Ed.2d 568 (1984). In so doing, it distinguished between remedies available for discriminatory misuse of federal funds and for discriminatory employment practices. The former problem was to be monitored by the funding agency, while employment discrimination conferred remedies on the victim employees through the EEOC-based enforcement process. *See Consolidated Rail Corp.,* 465 U.S. at 633 n. 13, 104 S.Ct. at 1253–54 n. 13; *Chowdhury v. Reading Hosp. & Med. Center,* 677 F.2d 317, 325–26 (3d Cir.1982) (Aldisert, J., dissenting), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983).

Remarkably, in twenty-eight years since the passage of Title VI, only three cases have addressed whether a hospital's discriminatory handling of physician staff privileges may "exclude [a physician] from participation in" or "subject [him] to discrimination under" federal funding programs.[1]

---

[1]The district court held that Title VI governs discrimination in physician staff privileges because of the retroactive applicability of the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988), 42 U.S.C. § 2000d–4a (Supp.1988). This statute mandates that Title VI apply "on an institution-wide basis, instead of only in connection with a limited program activity actually receiving federal funds...." *Leake v. Long Island Jewish Medical Center,* 695 F.Supp. 1414, 1416 (E.D.N.Y.1988), *aff'd,* 869 F.2d 130 (2d Cir.1989) (per curiam). We do not reach this issue. Harris Methodist has never asserted that Title VI applies on less than a hospital-wide basis; the dispute between the parties centers on other language in § 601. The question of statutory retroactivity of the 1987 Act remains open in our circuit. *Cf. Ayers v. Allain,* 893 F.2d 732, 754–55 (5th Cir.), *vacated,* 914 F.2d 676 (5th Cir.1990) (*en banc* ), *rev'd*

Those cases generally held that physician staff privileges are not covered by § 601.[2]

We conclude, based on the plainer reading of Title VI and our circuit's precedents, that physician staff privileges are protected from discriminatory actions by a hospital receiving federal funds. The contrary conclusions of the other cases shed light, however, on the ambit of this protection.

On its face, § 601 arguably covers private physicians on the staff privileges as persons who "participate in" or may be "subject to discrimination under" a federally-funded program or activity. That the terms "participate" and "subject to" have this broad meaning was reinforced by the Supreme Court in *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), where the Court held that *employees* who directly participate in federal education programs are covered by Title IX (which has no counterpart to § 604), not just the students who are the recipients of the aid. The Court stated:

> Employees who directly participate in federal programs or who directly benefit from federal grants, loans, or contracts clearly fall within the first two protective categories [of § 9012.... In addition, a female employee who works in a federally funded education program is "subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues.

456 U.S. at 520–21, 102 S.Ct. at 1917. The Court also observed that Congress could have narrowed the coverage of the anti-discrimination provision by limiting it to "students" or "beneficiaries" rather than "persons," 456 U.S. at 521, 102 S.Ct. at 1918. If employees are "persons" under Title IX, where no § 604 exclusion exists, so, it would seem, are non-employee physicians, without whom the hospital

---

*sub nom. United States v. Fordice,* —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (original panel held 1987 CRRA is retroactive). Only the U.S. Supreme Court can rectify the uncertainty it created on statutory retroactivity.

[2]*Doe v. St. Joseph's Hospital,* 788 F.2d 411 (7th Cir.1986); *Bhatt v. Uniontown Hospital,* 50 E.P.D. ¶ 39,207, 1986 WL 30681 (W.D.Pa.1986); *Vuciecevic v. MacNeal Memorial Hospital,* 572 F.Supp. 1424 (N.D.Ill.1983).

would be only a hotel. They "participate in" the federally funded programs, making the facilities usable as places of treatment, this is not to say that every vendor of supplies or services to a hospital that receives federal funds is a "participant" in the hospital operations protected by § 601.[3] But by direct analogy with *North Haven,* those who directly care for the patients "participate in" the federally funded programs.

Two of this circuit's cases support application of § 601 in this context. In *Diggs v. Harris Methodist Hospital,* 847 F.2d 270 (5th Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988), a physician removed from appellee's staff contended unsuccessfully that she was an "employee" of the hospital covered by Title VII. As a consequence of *Diggs,* staff physicians who are not "employees" of a hospital are not excluded by § 604 from § 601's blanket nondiscrimination protection. Earlier, this court authorized HHS to audit a hospital's compliance with the handicapped anti-discrimination law, § 504 of the Rehabilitation Act, based upon the complaint of a patient *not* covered by a federally funded program. *United States v. Baylor Univ. Med. Center,* 736 F.2d 1039 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985). Relying upon Title VI as the model for § 504, this court stated that Title VI prevents

> service providers receiving federal funds from discriminating in programs in which individual beneficiaries of aid participate. Title VI binds the services provider, or "recipient," thus it affords a remedy against discrimination by recipients to *all participants* in a federally funded program, not merely to the individual beneficiaries of federal aid.

736 F.2d at 1043–44 (emphasis added). This reasoning, if not *Baylor*'s direct holding, is applicable in the case before us.

---

[3]Indeed, most such vendors or suppliers have only an indirect effect on patient care either because their products are not medically related or because if so related, their products are not furnished with the intent or duty to further the federally-funded program. This is another way of saying that there must be some logical nexus between a person's "participation" and the federally funded program in order for § 601 to apply. *See Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 276 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982).

Also consistent with our reading of § 601 are HHS regulations, which, since shortly after the passage of Title VI, have mandated non-discrimination as to physicians' staff privileges by federally-funded hospitals. 45 C.F.R. § 80.5(e)(1990).

The three cases that have excluded physicians from § 601 are distinguishable from this case in an important respect: in each of them, an individual physician tried to challenge his termination from the hospital staff under an implied cause of action that the courts have recognized as a counterpart to the statutory provisions barring discrimination in connection with federally funded programs. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Title IX). Courts are understandably reluctant to second-guess hospitals' administrative and health care decisions in matters of staff privileges.[4] The courts' visceral aversion to permitting anti-discrimination legislation to further doctors' individual interests may also arouse sympathy. Such distasteful consequences are the unforeseen byproducts of engrafting an implied private cause of action upon statutes, like Title VI, that Congress expressly limited to agency enforcement.

Beyond their motivation, these cases are unpersuasive. *Bhatt* depends upon the physician's being an "employee" under § 604 and upon the court's conclusion that Medicare/Medicaid funding does not have a "primary objective" of securing employment through federal funding. In this context one must consider the statement, relied upon by Harris Methodist, that "there is no correlation between a physician's request for staff privileges and the receipt by a hospital of Medicare and Medicaid funds." *Bhatt* 's reliance upon the § 604 qualification is inappropriate in this circuit because, after *Diggs,* a physician is not a Title VII "employee" of a hospital where he has staff privileges. Similarly, in *Vuciecevic,* the court seemed to analogize the doctor's status to that of an employee who could not avail himself of § 601 directly unless, pursuant to § 604, it was a purpose of the federal

---

[4]Where public hospitals are concerned, courts have managed to avoid second-guessing medical decisions. *See, e.g., Leach v. Jefferson Parish Hosp. Dist. No. 2,* 870 F.2d 300 (5th Cir.), *cert. denied,* 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989); *Schuster v. Martin,* 861 F.2d 1369 (5th Cir.1988).

funding to benefit "the employment of physicians."  572 F.Supp. at 1429–30.

The Seventh Circuit's decision in *Doe* is, on close analysis, not really in conflict with our reading of § 601.  *Doe* reversed and remanded the doctor's § 601 claim so that she could attempt to plead that she was an "intended beneficiary" of the Title VI non-discrimination provision.  The court defined "intended beneficiary" all-inclusively as the "class of intended beneficiaries, applicants and participants" under § 601.  788 F.2d at 418 n. 11.  Contrary to the government's assertion, *Doe* is not founded on a misplaced (in this context) use of a "specific application of the intended beneficiary rule to employment practices," 788 F.2d at 419 n. 12;  Section 604 is incorporated by analogy, not as the main reason for the court's decision.  We can thus agree with this formulation to the extent that *Doe* uses "intended beneficiary" as a proxy for placing a logical limit on the class of persons who can benefit from § 601 as "participants" in a federally funded program.

The hospital also relies heavily upon provisions in the Medicare and Hill–Burton Acts that disavow government interference in the practice of medicine or the administration of hospitals.  The Medicare Act provides, in pertinent part:

> *Nothing in this subchapter* shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services;  or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395.  The Hill–Burton Act similarly states:

> *Except as otherwise specifically provided,* nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any facility with respect to which any funds have been or may be expended under this subchapter.

42 U.S.C. § 291m (emphasis added).  Insofar as both of those statutes are qualified by the underlined language, they do not prevent enforcement of §§ 601 or 604 of Title VI.  Nevertheless, they represent

a parallel policy of Congress that must be obeyed. In seeking to enforce §§ 601 and 604, HHS and the courts must bear in mind that Congress intended by these provisions that federal regulation should not lose sight of its ultimate goal of facilitating the delivery of medical care. Regulation may not operate in such a way as to "supervise or control" medical practice or hospital administration. Improper interference with the peer review process strikes at the heart of this prohibition.

Title VI covers physician staff privileges under § 601, subject to the proviso in § 604. HHS should not, however, "supervise or control" medical practice or hospital operations in its oversight of nondiscrimination. The next questions concern the scope of the agency's proposed investigation of Harris Methodist.

## CONSENT TO THE SEARCH

Although HHS's proposed action here is termed a compliance review, HHS essentially sought to search the hospital's peer review records, upon which physician staff privilege decisions are, in part, premised. HHS urges this court to hold, as a matter of law, that Harris Methodist consented to its administrative search. When Harris Methodist received federal Hill–Burton funds for a construction project in 1965 it executed an assurance of compliance with Title VI requirements. Those regulations included a requirement of non-discrimination in granting physician privileges. *See* 45 C.F.R. § 80.5(e); 29 Fed.Reg. 16298 (December 4, 1964). HHS asserts that, by signing the assurance of compliance, Harris Methodist has already agreed to *any* compliance review, including a full inquiry into physician staff privileges. HHS extends this argument to assurances of compliance signed in connection with receipt of Medicaid and Medicare funds, executed in the 1970's and 1980's.

The trial court found that Harris Methodist did not consent to the administrative search. The issue of consent to a search is normally a question of fact, upon which we will not reverse the trial court's determination unless it is clearly erroneous. *United States v. Ibarra,* 965 F.2d 1354 (5th Cir.1992) (en banc); *United States v. Coburn,* 876 F.2d 372, 374 (5th Cir.1989). HHS, however,

characterizes the issue of consent in this case as a question of law. Neither party factually disputes Harris Methodist's execution of assurances of compliance, leaving only the question whether such assurances constitute consent to a search.

Harris Methodist asserts that it could not have given a voluntary and informed consent to waive the right to challenge the reasonableness of administrative searches, because that right was not clearly defined at the time it executed the assurances of compliance. The Fourth Amendment interest now raised by Harris Methodist was not recognized until 1978 in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), and in this court's decision in the *NOPSI* trilogy. *See United States v. New Orleans Public Service, Inc.,* 723 F.2d 422 (5th Cir.1984) (*NOPSI III* ); *United States v. Mississippi Power & Light, Et Al.,* 638 F.2d 899 (5th Cir.) (*NOPSI II* ), *cert. denied, New Orleans Public Service, Inc. v. United States,* 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981); and *United States v. New Orleans Public Service, Inc.,* 553 F.2d 459 (5th Cir.), (*NOPSI I* ), *rehearing denied,* 559 F.2d 30 (1977), *vacated, New Orleans Public Service, Inc. v. United States,* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978). We disagree. That certain constitutional rights were not more fully refined until later court decisions is of little moment in this case. Additionally, while conceding that the 1965 assurance of compliance required Harris Methodist to comply with Title VI of the Civil Rights Act and all unambiguous associated requirements imposed in accordance with Title VI, Harris Met hodist now argues that it could not have been aware that physician staff privileges could be the subject of compliance reviews. But this assertion cannot be entirely candid, because from the earliest point, administrative regulations included physician staff privileges as a subject that the HEW and HHS regarded as within the purview of Title VI.

We agree with Harris Methodist, however, that any consent found in the execution of the assurances of compliance is consent only to searches that comport with constitutional standards of reasonableness. *See Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946), *rev'd on other grounds,* 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947). In *First*

*Alabama Bank of Montgomery v. Donovan,* 692 F.2d 714, 719 (11th Cir.1982), the Department of Labor sought to conduct a compliance review under an Executive Order prohibiting discrimination by government contractors. The bank refused to submit to the compliance review and argued that signing contracts with the government containing assurances of non-discrimination did not include consent to unreasonable or unconstitutional searches. The court agreed, noting that the government *did not dispute,* as it does in the case before us, that such consent does not extend to unreasonable or otherwise unconstitutional searches. 692 F.2d at 719. Finding *First Alabama Bank of Montgomery* to be persuasive authority, we expressly limit our holding that Harris Methodist consented to HHS compliance reviews only to those reviews which employ reasonable searches as that term is defined under the Fourth Amendment. *See First Alabama Bank of Montgomery,* 692 F.2d at 720. We reject the government's assertion that Fourth Amendment reasonableness standards do not apply when an administrative search is conducted pursuant to consent.[5] *See also Florida v. Jimeno,* ––– U.S. ––––, ––––, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) (consensual search deemed reasonable only as long as scope confined to reasonable bounds).

## REASONABLENESS OF THE PROPOSED SEARCH

The district court found that Harris Methodist was selected to be the subject of the compliance review arbitrarily and without any meaningful guidelines. The court further found the decision was made in the unreviewed discretion of an HHS field officer. The court also found that the decision was made without legislative or administrative standards, and without any administrative plan containing specific neutral criteria. Relying on its position that, except for questions as to the mode of inquiry, reasonableness standards are not relevant because of HHS's consent, the government affirmatively declines to challenge these findings.

---

[5]Harris Methodist makes a desultory contention that it rescinded and withdrew consent in 1986 when it began protesting the proposed compliance review. The hospital offers no citation to the record that would support a claim of an unequivocal act or statement withdrawing consent, nor is there evidence that Harris Methodist notified the government that it was terminating consent and would refuse to receive further federal funding. *See United States v. Alfaro,* 935 F.2d 64, 67 (5th Cir.1991).

Our determination of the reasonableness of the proposed search must begin with a balancing of two important competing public interests. *United States v. Martinez–Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). HHS seeks to achieve the purposes of Title VI—preventing discrimination against minority health care professionals and affording minority citizens the opportunity to seek health care at a non-discriminatory facility. Harris Methodist wishes to vindicate the confidentiality of peer review, a process critical to the advancement of quality health care. *See* 42 U.S.C. § 11101(5) (Congressional finding of overriding national need for confidentiality for physicians engaging in effective professional peer review). Congress again endorsed medical self-governance by its admonition that regulation should not "supervise or control" medical practice or hospital operations. Medicare Act, 42 U.S.C. § 1395; Hill–Burton Act, 42 U.S.C. § 291m. The peer review process provides a system in which a hospital's medical staff reviews, critiques, and suggests improvement in the skills and performance of their fellow physicians. We recognize "an overwhelming public interest in promoting improvement in health care through the mechanism of [physician] peer review." *Laws v. Georgetown University Hospital,* 656 F.Supp. 824, 826 (D.D.C.1987).

We have previously enunciated standards of reasonableness for searches associated with compliance reviews in *NOPSI III* and *NOPSI II.* In *NOPSI II* we held that at least three elements are necessary to establish the reasonableness of a proposed administrative search: 1) whether the proposed search is authorized by statute; 2) whether the proposed search is properly limited in scope; and, 3) how the administrative agency designated the target of the search. *NOPSI II,* 638 F.2d at 907. We reaffirmed that test in *NOPSI III,* 723 F.2d at 425. We review the first two elements as matters of law, and the final element as a matter of fact, affording clearly erroneous review. *NOPSI III,* 723 F.2d at 425. With regard to factual evaluation of the third element we have stated:

> The search will be reasonable if based either on (1) specific evidence of an existing violation, (2) a showing that "reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment]," [*Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) (quoting *Camara*

*v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 538, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)) ], or (3) a showing that the search is "pursuant to an administrative plan containing specific neutral criteria." 436 U.S. at 323, 98 S.Ct. at 1826.

*NOPSI III,* 723 F.2d at 425 (quoting *NOPSI II,* 638 F.2d at 907).

Here, the legal issues are readily resolved. We have concluded that HHS was authorized by statute to conduct some kind of search. As the appendix demonstrates, especially in the absence of information suggesting that the hospital routinely violated Title VI with respect to staff privileges, the scope of the proposed search is entirely too broad. It could not be conducted without chilling the peer review process, breaching confidentiality, and intrusively second-guessing medical judgments embodied in staff privilege and peer review decisions.

The district court relied upon the *NOPSI II* and *III* factual criteria to find that the compliance review was initiated arbitrarily and without proper administrative standards or plan.[6] Although not discounting the genuine governmental interest in compliance with Title VI, the critical public interest in effective peer review requires that the compliance review process be carefully limited by the standards cited in the *NOPSI* cases.

The decision to select Harris Methodist as the target of the compliance review was made by Davis Sanders, HHS Region VI director. Sanders testified that the investigation was intended to be extensive in scope, unlike any that had ever been conducted in Region VI. Sanders conceded that there was no administrative plan promulgating selection criteria. He testified that he had six or seven unwritten criteria in mind when he selected Harris Methodist, although he was unable to recall the full list of criteria at trial. Relying on the memory of one of Sanders' assistants, the government now states that Sanders employed nine criteria in making his selection decision. No written record was made of the decision process. *Cf. NOPSI III,* 723 F.2d at 428 ("Instead of trusting their memories,

---

[6]The record reveals no "specific evidence of an existing violation", nor even any complaint, that preceded the selection of the hospital for "compliance review."

officials should keep a written record of the criteria they use in each particular case.").

Although Sanders was able to articulate certain criteria, in response to probing by the trial court Sanders could not explain which factor or factors militated in favor of selecting Harris Methodist. One asserted criterion, avoidance of repetitive investigation of the same hospital, worked against selection of Harris Methodist. Harris Methodist had been the subject of an investigation concerning physician staff privileges in 1984, an investigation which Sanders termed satisfactory. That investigation concluded that Harris Methodist had not violated Title VI in regard to physician staff privileges. No hospital in the adjoining community of Dallas, site of HHS Region VI headquarters, had been the subject of physician staff privilege review since at least 1980.

Similarly, the asserted criterion of community/physician demographics supported the selection of a hospital other than Harris Methodist. Sanders testified that he considered the total number and percentage of minority physicians and patients in the surrounding community. However, evidence adduced at trial demonstrated that there were numerous metropolitan hospitals in counties in Region VI with greater percentages of minorities and greater total numbers of minorities than Tarrant County, the county in which Harris Methodist is situated. More significantly, there were numerous other metropolitan hospitals in counties with greater percentages of minority physicians, and a greater number of minority physicians. Sanders conceded that he was aware that Harris Methodist's percentage of minority staff positions was at least as great as the percentage of minorities in the surrounding community. Sanders admitted that this ratio, coupled with the fact that Harris Methodist had a higher percentage of minority physicians on staff than other Region VI hospitals, mitigated against the selection of Harris Methodist for the compliance review.

Several of Sanders' other stated criteria further suggested that his decision was arbitrary. For example, Sanders cited budgetary woes restricting travel expenses as the reason for selection of a Fort Worth Hospital. However, an HHS investigator assigned to Region VI testified that he routinely

traveled to all five states in Region VI to conduct compliance reviews. Moreover, there were several hospitals located in much closer proximity to HHS regional headquarters in Dallas, Texas. Sanders also stated that he wished to establish an HHS "presence" in Fort Worth. This is a curious claim since HHS had conducted an investigation in Fort Worth in 1984, and yet had conducted no investigations in Dallas since 1980. Finally, Sanders asserted that he considered compliance data in his selection decision. Although the government now asserts that there were informal complaints of discrimination in denying physician staff privileges at Harris Methodist, this claim is wholly unsupported by the record, and stands in direct contradiction to HHS's responses to interrogatories. Again, Sanders conceded that this factor should have been resolved in favor of selecting a hospital other than Harris Methodist for compliance review.

In *NOPSI II,* the court stressed the importance of limiting the discretion of field enforcement officers through administrative oversight of compliance review decisions. 638 F.2d at 907–08. HHS established a Annual Operating Plan which included a section requiring notification to senior HHS officials and justification for each compliance review decision. The Plan mandated advance written approval or disapproval for each compliance review. Those procedures were not followed with regard to Harris Methodist. Sanders made one telephone call to notify a mid-level HHS official of his selection. Considering the slipshod manner in which the selection criteria were developed and followed—if indeed followed—we agree with the trial court's conclusion that Sanders acted arbitrarily and without an administrative plan containing neutral criteria.

It would be inappropriate for us to specify criteria that would have substantiated a reasonable search of this hospital's peer review records. The *NOPSI* cases provide general guidance that should be augmented by particular agency deference to matters of medical judgment and to the need for confidentiality. HHS's proposed compliance review of Harris Methodist satisfied none of these concerns.

PRIVILEGE

Harris Methodist asserts that the physician peer review materials sought in the compliance review are subject to privilege and therefore protected from the scope of the HHS investigation. Harris Methodist relies on three district court cases involving alleged medical malpractice in which the court granted a privilege against discovery of peer review documents. *See Laws v. Georgetown University Hospital, supra; Mewborn v. Heckler,* 101 F.R.D. 691 (D.D.C.1984); *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.), *aff'd,* 479 F.2d 920 (D.C.Cir.1973). In contrast, HHS relies on the Supreme Court's recent pronouncement in *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), in which the Court held that a university was not able to protect from disclosure, by means of any evidentiary privilege, peer review materials utilized in the tenure decision-making process. 493 U.S. at 194, 110 S.Ct. at 585.

As Congress has recognized, peer review materials are sensitive and inherently confidential, and protecting that confidentiality serves an important public interest. 42 U.S.C. §§ 11101(5), 11137(b). HHS cannot administratively override the goal of this statute. Unlike the privilege claim for faculty tenure decisions rejected in *University of Pennsylvania v. EEOC,* as well as potential analogous claims by "writers, publishers, musicians, [and] lawyers," 493 U.S. at 194, 110 S.Ct. at 585, the medical peer review process "is a *sine qua non* of adequate hospital care." *Bredice,* 50 F.R.D. at 250. However, because we affirm the district court's determination that the proposed search exceeded bounds of reasonableness, we need not define the scope of any applicable privilege.

We note that HHS offered its commitment that peer review materials would be kept confidential and that Harris Methodist need supply only redacted records, thus minimizing disclosure concerns. HHS is bound by its own regulations to protect the confidentiality of peer review materials obtained in the course of compliance reviews. 45 C.F.R. § 80.6(c) (1990). HHS has also agreed that the district court could issue an appropriate order tailoring the scope of any compliance review and establishing particular requirements to protect sensitive documents. If HHS continues to pursue this

type of compliance review, its targets are always free to seek the assistance of the courts when necessary to protect restricted access materials.

## CONCLUSION

The scope of Section 601, the anti-discrimination provision of Title VI, extends to non-employee physician staff privileges at a hospital receiving federal funds. To that end, HHS may conduct appropriate compliance reviews. In this case, Harris Methodist consented to reasonable searches in the form of compliance reviews by executing assurances of compliance with Title VI and by accepting federal funding associated with Title VI. However, we hold that consent to extend only to *reasonable* searches. We affirm the trial court's finding that the proposed search did not meet Fourth Amendment standards of reasonableness. Because the search was not properly initiated, the compliance review shall proceed no further.

AFFIRMED.

## APPENDIX

HHS Investigative Plan for Harris Methodist–Fort Worth Hospital

### V. COMPLIANCE STANDARD

The Office for Civil Rights will examine Harris Hospital–Methodist's policies, procedures, and practices relating to physician staff privileges to determine whether they subject minority physicians to disparate treatment or whether they have the effect of discriminating against the physicians on the basis of race, color, or national origin. In order to make this determination, OCR first will seek to determine whether the hospital's policies, procedures or practices have a disproportionate adverse effect on minority physicians. If OCR determines that the policies, practices, or procedures do not result in a disproportionate adverse effect, OCR will make a no violation determination.

If OCR determines that Harris Hospital–Methodist's policies, procedures, or practices have

a disproportionate adverse effect on minority physicians, OCR must determine whether the policies, procedures or practices are necessary to achieve a legitimate program objective identified by the recipient. If OCR determines that Harris Hospital–Methodist's policies, procedures or practices have disproportionate adverse effect on minority physicians, but are not necessary to achieve a legitimate program objective, OCR will find a violation.

If OCR determines that Harris Hospital–Methodist's policies, procedures or practices have a disproportionate adverse effect on minority physicians, but are necessary to achieve a legitimate program objective, OCR must determine whether the hospital has available alternative means of achieving the program objective(s) that would result in a less disproportionate adverse effect. If OCR determines that Harris Hospital–Methodist has no such alternative(s) available, OCR will make a no violation determination. If alternatives are available, use of the policies, procedures or practices in question would be a violation.

To determine if minority physicians are subjected to disparate treatment, OCR will examine whether there are differences in policy or in practice in the application of eligibility criteria for staff privileges, whether for purposes of retaining staff privileges minority physicians in policy or in practice are required to meet different terms and conditions, and whether minority physicians are subjected to disparate treatment during the exercise of their staff privileges or as a part of the application process.

## VI. INVESTIGATIVE ACTIVITIES

OCR will pursue the investigation of Harris Hospital–Methodist's compliance with Title VI with respect to staff privileges by engaging in the following activities:

1. Determine the number of physicians by race, color, or national origin by specialty in the service area.

2. Determine the number of all physicians with Harris Hospital–Methodist staff privileges according

to the race, color, or national origin of the physicians, their respective specialties, and their type of staff privileges.

3. Analyze Harris Hospital–Methodist's written policies that have a direct or indirect relationship to the granting, retention, evaluation, and withdrawal of staff privileges.

4. Analyze all relevant records maintained by Harris Hospital–Methodist that demonstrate the hospital's practices with respect to membership staff privileges.

5. Interview Harris Hospital–Methodist staff and decision makers who directly or indirectly affect staff privilege decisions.

6. Interview physicians whose staff privileges have been granted, denied, modified or withdrawn based on decisions or actions by the hospital.

7. Interview community representatives who have relevant information about the hospital's actions and activities related to physician staff privileges.

## VII. DATA NEEDS

OCR will obtain data, information, and evidence based on direct requests to the recipient, information provided by witnesses and persons generally knowledgeable about hospital staff privilege procedures and requirements, information available through DHHS OPDIVs and the region, and investigation related research.

*1. Identify physicians by race, color, or national origin, and specialty in the hospital service area.

2. Hospital's organizational chart, including explanations of relationship between various organizational units and sub-units, and the identification of organization officers and administrators directly or indirectly responsible for evaluating, approving, withdrawing, and/or denying staff privileges, by name, and title.

3. Descriptions of hospital's services and programs, including ancillary services and programs.

4. Hospital's nondiscrimination policy.

5. Description of hospital's geographic service area.

*6. The population of the service area by race, color, or national origin.

7. Hospital's referral and recruitment sources for staff physicians and the applicable policies and procedures. Breakdown by referral source of number referred, number of applicants and number approved.

8. Hospital's committees responsible for evaluating staff privilege applications, recommending and/or approving the granting, retention or withdrawal of staff privileges, including the identification of committee members by race, color, or national origin type of privilege, specialty, committee responsibility, and any policies and procedures that govern the committee(s)' operations and activities.

9. Hospital's staff privilege and applications, including all necessary application forms, credentials request documents, reference request documents, staff privilege contracts, standards of conduct for staff physicians, and the applicable policies and procedures governing the staff privilege application process.

10. Description of the types of staff privileges available at the hospital, including the eligibility criteria, rights, limitations and responsibility(ies) associated with each, by specialty.

11. The identification of all persons at the hospital responsible for monitoring and evaluating physicians' compliance with hospital staff privilege requirements. Include persons who are responsible for collecting/analyzing data and information used in the evaluation/monitoring process, by name, status, specialty (if applicable) and race, color, or national origin, [p]olicies and procedures that govern the monitoring and evaluation process.

12. Hospital policies and procedures for terminating or modifying staff privileges and instituting disciplinary actions for staff privilege violations, including a description of violations that warrant discipline and the applicable disciplinary actions, and a detailed description of available due process procedures.

13. Listing of all physicians currently and over the past 3 years with staff privileges at the hospital, by type of privilege, specialty, and race, color, or national origin organized according to the date in which the privileges were granted.

14. Listing of all physicians who have requested hospital staff privileges over the past 3 years, by type of privilege requested, and each applicant's specialty and race, color, or national origin and the disposition of each application, including the basis for the disposition, organized by date of application and date of disposition.

15. Listing of all physicians who have resigned the hospital staff privileges, had their privileges involuntarily withdrawn or modified, or otherwise been subjected to disciplinary sanctions due to staff privilege violations within the past 3 years, organized by year, by type privilege, specialty, race, color, or national origin and reason(s) for the resignation, involuntary withdrawal or modification, and/or disciplinary action, to include the type and extent of the disciplinary action imposed.

Responses to requests concerning information by race, color, and national origin should be organized according to the following U.S. Census Bureau designations.

16. Listing of all physicians whose staff privileges have been modified for other than disciplinary reasons with the past 3 years, organized by year, the type and reason for the modification, original privilege or status, and type of privilege after modification, by race, color, or national origin and specialty.

17. Minutes and records of specific actions of various committees and boards affecting the granting, amending and terminating, of staff privilege of individuals for the past 3 years.

18. Executed contractual agreements the hospital has with physician groups.

19. Reports, surveys, etc., that discuss issues and problems relating to physician staff privileges at hospital.

\* Data item will not be requested from recipient.

....

Interviews:

 1. Hospital personnel that will be interviewed during the onsite review may include but will not be restricted to the following:

Complete

 2. Community contacts will be interviewed during the onsite:

Complete